**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Ryan Six, | No. CV-22-00203-PHX-MTL |
| Plaintiff, | **ORDER** |
| v. | |
| IQ Data International Incorporated, | |
| Defendant. | |

Every day, millions of people receive unwanted mail. Extend the warranty on your car, buy-one-get-one-free teriyaki bowls, an upstart landscaper wants your business, and the like. Sometimes a collection agency sends a recalcitrant debtor a letter asking for payment. Ryan Six, the plaintiff here, got one such letter and now he makes a federal case out of it. The Court is asked to rule on Defendant IQ Data International Incorporated's ("IQ Data") and Six's competing Motions for Summary Judgment (Docs. 62, 112). But doing so is not necessary because Six lacks Article III standing. The Court dismisses this action for lack of jurisdiction.

## I.      BACKGROUND

Six sues IQ Data, alleging that the company violated the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.*, by sending him a collection letter after he informed IQ Data of his representation by counsel. The debt obligation stems from an allegedly unpaid invoice for Six's breach of a residential lease. (Doc. 1 ¶ 9.) In June 2017, the debt obligation was placed with IQ Data, a professional collection agency providing

services to the residential apartment industry. (Doc. 62 at 4.) On August 18, 2021, Six mailed a dispute letter to Equifax claiming that he had no recollection of the debt account and requesting documentation verifying the debt account information. (Doc. 63-1 at 21.) On that same day, Six's prior counsel mailed a letter to IQ Data advising that he had retained counsel in connection to the subject debt and directing IQ Data to send all communication related to the subject debt to counsel. (*Id.* at 23.)

While the parties dispute the precise timeline of what happened next, the following is uncontroverted. On September 2, 2021, IQ Data, having received and processed the dispute letter forwarded from Equifax, submitted a system request to generate and send a letter providing documentation and notice of the debt to Six's updated address. (Doc. 62 at 5; Doc. 112 at 4.) The next day, on September 3, 2021, IQ Data updated its records to reflect that it had processed the letter from counsel, that Six was represented by counsel, and that there should not be any direct communication with Six. (Doc. 62 at 6; Doc. 112 at 4.) On that same day, however, IQ Data's collection letter providing documentation and re-issuing notice of the debt was sent to Six's updated mailing address. (*Id.*) Six alleges that IQ Data violated 15 U.S.C. § 1692c(a)(2) by communicating directly with him—by sending the letter—despite knowledge of his representation by counsel. (Doc. 1 ¶¶ 21–22.)

## II.   LEGAL STANDARD

Federal courts are courts of limited jurisdiction. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). As relevant here, Article III of the United States Constitution limits the jurisdiction of federal courts to cases and controversies. U.S. CONST. art. III, § 2. "Standing is a constitutional requirement for the exercise of subject matter jurisdiction over disputes in federal court." *Tailford v. Experian Info. Sols., Inc.*, 26 F.4th 1092, 1099 (9th Cir. 2022) (citing *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016)). Indeed, federal courts cannot decide the merits of a case unless they "have subject-matter jurisdiction, which requires the plaintiff have Article III standing." *Adams v. Skagit Bonded Collectors, LLC*, 836 F. App'x 544, 545 (9th Cir. 2020) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93–95 (1998)).

The "irreducible constitutional minimum of standing" consists of three components. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). The party invoking federal jurisdiction must prove that: "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000) (citing *Lujan*, 504 U.S. at 560–61)). The parties focus their argument solely on the first element of standing—injury in fact.

Article III standing requires a concrete injury even in the context of a statutory violation. *See Spokeo*, 578 U.S. at 341 (explaining that a plaintiff cannot "for example, allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury-in-fact requirement of Article III"). In determining whether a plaintiff has suffered a concrete injury due to a defendant's failure to comply with a statutory requirement, the Ninth Circuit directs courts to apply a two-step test: "(1) whether the statutory provisions at issue were established to protect [a plaintiff's] concrete interests (as opposed to purely procedural rights), and if so, (2) whether the specific procedural violations alleged in this case actually harm, or present a material risk of harm to, such interests." *Tailford*, 26 F.4th at 1099; *see also Robins v. Spokeo, Inc.*, 867 F.3d 1108, 1113 (9th Cir. 2017).

## III.   DISCUSSION

IQ Data moves for summary judgment on the grounds that Six lacks standing to bring suit, that it lacked the required knowledge to commit a violation of the FDCPA, and that any violation of the FDCPA was merely the result of a bona fide error. (Doc. 62 at 3.) IQ Data also requests an award of attorneys' fees and costs, arguing that Plaintiff filed his Complaint "in bad faith with the intent to harass and extort . . . ." (*Id.* at 4.) For his part, Six argues that he is entitled to summary judgment because IQ Data had actual notice of Six's counsel's letter before it sent him its collection letter and IQ Data "cannot prove a single element" of its bona fide error defense. (Doc. 112 at 2–9.) Six further maintains that

1    he has standing to pursue his claims. (*Id.* at 9.)

2       **A.** **Article III Standing**

3       Standing is a threshold issue for the maintenance of this suit. Accordingly, the Court

4    begins its inquiry with this issue.

5        **1.** **Concrete Interests**

6       To identify the concrete interests protected by statutory provisions, courts "examine

7    historical practice and the legislative judgment underlying the provisions at issue." *Adams*,

8    836 F. App'x at 546 (citing *Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1117 (9th Cir.

9    2020)) (cleaned up). As to historical practice, "it is instructive to consider whether an

10   alleged intangible harm has a close relationship to a harm that has traditionally been

11   regarded as providing a basis for a lawsuit in English or American courts." *Spokeo*, 578

12   U.S. at 341; *see also TransUnion LLC v. Ramirez*, — U.S. —, 210 L. Ed. 2d 568, 141 S.

13   Ct. 2190, 2204 (2021) ("Various intangible harms can also be concrete. Chief among them

14   are injuries with a close relationship to harms traditionally recognized as providing a basis

15   for lawsuits in American courts."). Regarding legislative judgment, "[c]ourts must afford

16   due respect to Congress's decision to impose a statutory prohibition or obligation on a

17   defendant, and to grant a plaintiff a cause of action to sue over the defendant's violation of

18   that statutory prohibition or obligation." *TransUnion*, 141 S. Ct. at 2204.

19       **a.** **Historical Practice**

20      Six argues that he "suffered intangible harm similar to intrusion upon

21   seclusion . . . ." (Doc. 112 at 13.) The Supreme Court has expressly listed the common law

22   tort of intrusion upon seclusion as one of those harms bearing a close relationship to harms

23   traditionally regarded as providing a basis for a lawsuit. *TransUnion*, 141 S. Ct. at 2204.

24   IQ Data does not dispute that the tort of intrusion upon seclusion is one of those harms

25   traditionally regarded as providing a basis for a lawsuit. Rather, IQ Data argues that any

26   intangible harm suffered from receiving a single letter after providing notice of

27   representation does not bear a close relationship to the harm suffered by intrusion upon

28   seclusion. (Doc. 116 at 7.)

The common law tort of intrusion upon seclusion occurs when one "intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concern . . . if the intrusion would be highly offensive to a reasonable person." Restatement (Second) of Torts § 652B (1977). The tort "consists solely of an intentional interference with [a person's] interest in solitude or seclusion, either as to his person or as to his private affairs or concerns, of a *kind* that would be highly offensive to a reasonable man." *Id.* at cmt. a (emphasis added).

The Ninth Circuit has not yet considered whether the alleged harm caused by an unwelcome letter bears a close relationship to harm suffered from intrusion upon seclusion. Six, therefore, directs the Court's attention to the Tenth Circuit's decision in *Lupia v. Medicredit, Inc.*, 8 F.4th 1184 (10th Cir. 2021), and the Sixth Circuit's recent decision in *Ward v. NPAS, Inc.*, 63 F.4th 576 (6th Cir. 2023). (Doc. 112 at 12; Doc. 122 at 1.) In *Lupia*, the Tenth Circuit found that a single unwelcome phone call related to a disputed medical debt, though insufficient to give rise to liability at common law, "poses the same *kind* of harm recognized at common law—an unwanted intrusion into plaintiff's peace and quiet." 8 F.4th at 1192 (citation omitted). Similarly, in *Ward*, the Sixth Circuit found that "[u]nwanted phone calls are the type of intrusive invasion of privacy that [the tort of intrusion upon seclusion] seeks to prevent." 63 F.4th at 580 (internal marks and citations omitted). This is so, the Sixth Circuit reasoned, even when "the volume of such calls may be too minor an annoyance to be actionable at common law." *Id.* at 581 (citation omitted). Both *Lupia* and *Ward* found the Seventh Circuit's decision in *Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458 (7th Cir. 2020), instructive on this point. In that case, then-Judge Barrett reasoned that, in assessing intangible injuries and their relationship to common law harms, courts "are meant to look for a close relationship in kind, not degree." *Gadelhak*, 950 F.3d at 462. Therefore, although a single unwanted phone call may not give rise to common law liability, the harm suffered by its receipt bears a close relationship in kind to the harm suffered from intrusion upon seclusion.

According to Six, just as an unwanted phone call or text message intrudes upon an

individual's seclusion, so too does an unwelcome letter placed in his mailbox. But as the Seventh Circuit most recently clarified, "[i]ntrusion upon seclusion requires more than just an emotional response—it requires a particular kind of offensive intrusion." *Pucillo v. Nat'l Credit Sys., Inc.*, 66 F.4th 634, 640 (7th Cir. 2023) (citing *Gadelhak*, 950 F.3d at 462–63)). Mindful that courts should evaluate the kind of harm rather than the degree, *Pucillo* makes clear that only those particularly offensive intrusions are similar in kind to intrusion upon seclusion. Moreover, the tort generally seeks to guard against invasion of privacy by some "form of investigation or examination into [one's] private concerns, as by opening his private and personal mail, searching his safe or his wallet, examining his private bank account, or compelling him by a forged court order to permit an inspection of his personal documents." *Nayab v. Capital One Bank (USA), N.A.*, 942 F.3d 480, 491 (9th Cir. 2019) (quoting Restatement (Second) of Torts § 652B)).[1] Indeed, courts have reasoned that intrusion upon seclusion is largely concerned with "eavesdropping, wiretapping, and looking through one's personal documents." *Salcedo v. Hanna*, 936 F.3d 1162, 1171 (11th Cir. 2019).

Receiving a letter with undisputedly accurate information, specifically requested from a different source, can hardly be said to constitute a particularly offensive intrusion. *See Pucillo*, 66 F.4th at 640 (reasoning that "there is nothing inherently bothersome, intrusive, or invasive about a collection letter delivered via U.S. Mail"). That "[c]ourts have also recognized liability for intrusion upon seclusion for irritating intrusions[,] such as when telephone calls are repeated with such persistence and frequency as to amount to a course of hounding the plaintiff[,]" does not lead to a differing conclusion. *Gadelhak*, 950 F.3d at 462 (internal marks and citations omitted). As *Pucillo* explains, text messages and phone calls differ in kind from the letter at issue here. "Text messages may create an injury because they can disrupt a person anytime, anywhere, thereby invading private solitude." *Pucillo*, 66 F.4th at 641 (internal marks and citation omitted). And the "undesired buzzing

---

[1] In *Nayab*, a Fair Credit Reporting Act case, the Ninth Circuit found that "the release of highly personal information . . . is the same harm that forms the basis for the tort of intrusion upon seclusion." 942 F.3d at 491–92.

of a cell phone . . . like the unwanted ringing of a phone from a call, is an intrusion into peace and quiet in a realm that is private and personal." *Gadelhak*, 950 F.3d at 462 n.1. On the other hand, a letter delivered to an individual's mailbox does not intrude into the recipient's seclusion in a realm that is private and personal. Indeed, at his deposition, Six admitted that he did not know when the letter came to his to mailbox. (Doc. 112-1 at 56.) This admission is unsurprising given that "[m]ail can be picked up when, if, and how often the recipient chooses, unlike a phone which is usually on one's person or close by throughout the day." *Pucillo*, 66 F.4th at 641. It is difficult to see how a letter delivered to a mailbox, unbeknownst to Six, and to be retrieved at his leisure, in a mailbox where he receives countless articles of correspondence, some desired and some not, results in a harm similar in kind to the irritating intrusion into the peace and quiet of a private and personal realm caused by phone calls and text messages. *Cf. Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1043 (9th Cir. 2017) (finding that "[u]nsolicited telemarking phone calls or text messages, by their nature, invade the privacy and disturb the solitude of their recipients"). Therefore, the Court finds that Six's alleged harm does not bear a close relationship to a harm traditionally regarded as providing a basis for a lawsuit.

### b.   Congressional Judgment

As Congress is "well positioned to identify intangible harms that meet minimum Article III requirements, its judgment is also instructive and important." *Spokeo*, 578 U.S. at 341. That said, Congress may not "simply enact an injury into existence, using its lawmaking power to transform something that is not remotely harmful into something that is." *TransUnion*, 141 S. Ct. at 2205 (citations omitted). And courts cannot "treat an injury as concrete for Article III purposes based only on Congress's say-so." *Id.* (citations omitted).

Congress enacted the FDCPA to "eliminate abusive debt collection practices, to ensure that debt collectors who abstain from such practices are not competitively disadvantaged, and to promote consistent state action to protect consumers." *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 577 (2010). Insofar as

Congress intended to prevent invasions of individual privacy through the passage of the FDCPA, only those "[a]busive debt collection practices" that "contribute to . . . invasions of individual privacy" are referenced in the statute. 15 U.S.C. § 1692(a); *see also Cohen v. Rosicki, Rosicki & Assocs., P.C.*, 897 F.3d 75, 81 (2d Cir. 2018) ("Congress enacted the FDCPA to protect against the abusive debt collection practices likely to disrupt a debtor's life.").

A debt collectors' mailing of a single letter containing accurate information to a debtor's mailbox after that debtor requested information verifying the debt from a credit reporting agency is not the kind of abusive debt collection practice the FDCPA seeks to prevent. *See Pucillo*, 66 F.4th at 641–42 (finding that "sending two letters, one year apart and without any tangible consequences for the recipient, is not the kind of abusive practice Congress sought to prevent"). And, as analyzed above, the intrusion into the peace and seclusion presented by unwanted phone calls differs materially from the receipt of a letter in a mailbox—even though both actions on behalf of the debt collector are violative of the statute if it has knowledge of a debtor's representation by counsel. In essence, not every violation of 15 U.S.C. § 1692c(a)(2) necessarily threatens the recipient's concrete interests. Therefore, the Court considers the alleged violation here more procedural than substantive. *See Campbell*, 951 F.3d at 1119 n.8 (reasoning that "*procedural* obligations . . . *sometimes* protect individual interests," while violations of "*substantive* right[s]" always cause concrete harm) (citation omitted).

## 2.    Actual Harm or Risk of Harm

Six also fails to allege actual harm or material risk of harm to the interests protected by the FDCPA. For one, Six's Complaint does not contain a single allegation that he acted or forewent any action because of the letter. Indeed, the Complaint does not allege any harm beyond a mere procedural violation. *See Bassett v. ABM Parking Servs.*, 883 F.3d 776, 779 (9th Cir. 2018) (reiterating that "a bare procedural violation, divorced from any concrete harm, cannot satisfy the injury-in-fact requirement of Article III") (internal marks and citation omitted); *see also TransUnion*, 141 S. Ct. at 2205 ("[U]nder Article III, an

injury in law is not an injury in fact."). And as discussed above, the FDPCA is designed to protect against abusive debt collecting practices absent here.

For the first time in his summary judgment briefing, Six alleges that the collection "letter made him angry, frustrated, and stressed." (Doc. 112 at 13.) Six maintains that this resulted "in his heart racing, a feeling of being overwhelmed, loss of appetite, and loss of sleep." (*Id.*)[2] Again, the Ninth Circuit "has not yet considered whether . . . allegations of intangible harm—emotional distress, loss of personal reputation, and loss of personal time—without more, suffice as concrete injury-in-fact for standing purposes in a FDCPA case in view of *TransUnion*." *Samano v. LVNV Funding, LLC*, No. 1:21-CV-01692-SKO, 2022 WL 1155910, at *3 (E.D. Cal. Apr. 18, 2022). On the other hand, the Seventh Circuit "ha[s] expressly rejected 'stress' as constituting concrete injury following an FDCPA violation." *Wadsworth v. Kross, Lieberman & Stone, Inc.*, 12 F.4th 665, 668 (7th Cir. 2021) (quoting *Pennell v. Glob. Tr. Mgmt.*, 990 F.3d 1041, 1045 (7th Cir. 2021)). A plaintiff "must show harm beyond emotional response, such as an adverse credit rating or detrimental action that the plaintiff took in reliance on the letters." *Pucillo*, 66 F.4th at 639.

As an initial matter, it is not clear that Six's emotional responses are at all traceable to the collection letter. At his deposition, Six stated that he "even lost a few nights' sleep over this debt." (Doc. 112-1 at 58.) But this describes a response to the existence of a debt, not the response to a letter following notice of representation. And "federal courts may entertain FDCPA claims only when the plaintiff suffers a concrete harm that he wouldn't have incurred had the debt collector complied with the Act." *Wadsworth*, 12 F.4th at 669. Here, if Six's loss of sleep is driven by the existence of the debt, this harm is suffered regardless of whether IQ Data complied with the FDCPA. Nevertheless, as mentioned above, Six's anger, frustration, and stress are insufficient to establish a concrete injury. *See Id.* at 668 (finding that these "are quintessential abstract harms that are beyond our power

---

[2] The Court disagrees with Six's characterization of these harms as tangible. (Doc. 112 at 13.) The Supreme Court has referred to "traditional tangible harms" as those that cause "physical or monetary injury to [a] plaintiff[.]" *TransUnion*, 141 S. Ct. at 2204. The Court finds the alleged anger, frustration, and stress to be dissimilar to traditional tangible harms causing physical or monetary damage. Indeed, it is difficult to quantify "loss of appetite" or "loss of sleep." Thus, the Court also considers these to be intangible injuries.

to remedy").[3]

In sum, neither historical practice nor Congressional judgment establishes that Congress enacted the FDCPA to protect against the intangible harm Six alleges here and Six fails to show any other actual harm or material risk of harm to the interests protected by the FDCPA.

### B.     IQ Data's Request for Fees

IQ Data argues that it "should be awarded fees and costs accrued from defending against [Six's] scheme and frivolous claim." (Doc. 62 at 15.) The FDCPA provides that on "a finding by the court that an action . . . was brought in bad faith and for the purpose of harassment, the court may award to the defendant attorney's fees reasonable in relation to the work expended and costs." 15 U.S.C. § 1692k(a)(3). IQ Data claims that Six and his counsel "knew there was no standing at the time the frivolous lawsuit was filed." (*Id.* at 16.) The Court finds that the action was not brought in bad faith or for the purposes of harassment. Ironically, the Court previously found that IQ Data and its counsel recklessly filed a frivolous Rule 11 motion for the bad faith purpose of leveraging a settlement, denied Six's requests for an extension of time in bad faith, and misrepresented its reasoning for requesting a modification of the Scheduling Order to the Court. (Doc. 106 at 42–43.) Considering this context, IQ Data's request for attorneys' fees exhibits a striking lack of self-awareness. It is denied.

. . .

. . .

. . .

. . .

. . .

. . .

---

[3] For the first time in his supplemental briefing, Six claims that he received text/push notification to his cell phone notifying him that there was mail ready to be picked up at his mailbox. (Doc. 126 at 4.) But Six does not allege that IQ Data sent him the text message and provides no other information on the origins of the message. This tardy and vague allegation does not alter the Court's conclusion.

**IV.    CONCLUSION**

Six has not alleged a concrete injury to satisfy Article III standing for his FDCPA claim. The Court is, therefore, without jurisdiction to adjudicate the merits of his claim.

Accordingly,

**IT IS ORDERED:**

1.      This case is **dismissed** for lack of subject matter jurisdiction.

2.      Defendant IQ Data International Incorporated's Motion for Summary Judgment (Doc. 62) is **denied as moot**.

3.      Plaintiff Ryan Six's Motion for Summary Judgment (Doc. 112) is **denied as moot**.

4.      Plaintiff Ryan Six's Motion to Strike Expert Disclosure or Exclude Expert (Doc. 68) is **denied as moot**.

5.      The Clerk of Court is instructed to terminate this case.

6.      The Court retains jurisdiction to resolve Plaintiff's Motion for Attorneys' Fees (Doc. 109), which remains pending and will be resolved in a separate order.

Dated this 18th day of May, 2023.

_Michael T. Liburdi_

Michael T. Liburdi
United States District Judge